IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

JUSTIN SCOTT,                         §
                                      §
            Plaintiff,                §
                                      §
v.                                    §              1:16-CV-1287-RP
                                      §
GREG WHITE and                        §
THE CITY OF AUSTIN,                   §
                                      §
            Defendants.               §

## ORDER

Before the Court is the Rule 12(c) Motion for Judgment on the Pleadings filed by

Defendants City of Austin ("the City") and Gregory White ("White") (together, "Defendants"),

(Dkt. 40), along with the parties' responsive briefing. Having considered the parties' arguments, the

evidence, and the applicable law, the Court will grant the motion in part and deny the motion in

part.

## I. BACKGROUND

Plaintiff Justin Scott ("Scott") alleges that White, a police officer employed by the Austin

Police Department ("APD"), stopped Scott without reasonable suspicion, attacked him without

provocation, used excessive force to subdue him, and then arrested him without probable cause.

(Second Am. Compl., Dkt. 15, at 3–5). Scott asserts causes of action against White pursuant to 42

U.S.C. § 1983 ("Section 1983") for violations of his rights under the Fourth and Fourteenth

Amendments to the United States Constitution. (*Id.* at 8–13). Scott also asserts Section 1983 claims

against the City on the basis of an alleged policy and practice of permitting the use of excessive force

and an alleged failure to adequately train or supervise its officers. (*Id.* at 5–8; 13–17). White asserts

that he is entitled to qualified immunity. (Second Am. Answer, Dkt. 17, at 8–9).

Defendants filed the instant motion for judgment on the pleadings on October 19, 2017. (Mot. J. Plead., Dkt. 40). Scott failed to timely respond, (*see* R. & R., Dkt. 43), but the Court declined to grant Defendants' motion as unopposed and permitted Scott additional time to respond. (Order, Dkt. 50). Scott then timely filed a response, (Dkt. 54), and Defendants replied, (Dkt. 58).

## II. LEGAL STANDARD

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) "is subject to the same standards as a motion to dismiss under Rule 12(b)(6)." *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 209–10 (5th Cir. 2010). Dismissal under Rule 12(b)(6) is appropriate only if the complaint fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To satisfy this standard, the complaint must provide more than conclusions, but it "need not contain detailed factual allegations." *Colony Ins. Co. v. Peachtree Const., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011). It must, however, allege enough facts to move the claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Determining whether the plausibility standard has been met is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Rule 12(b)(6) motions are "viewed with disfavor and . . . rarely granted." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (citation and quotation marks omitted).

In deciding a motion to dismiss, a court may consider video evidence attached as an exhibit to the complaint; when doing so, "the court is not required to favor plaintiff's allegations over the video evidence." *Hartman v. Walker*, 685 F. App'x 366, 368 (5th Cir. 2017). That said, the standard for adopting video evidence over a plaintiff's allegations "is a demanding one: a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account." *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 730

(5th Cir. 2018); *see also Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (holding that the court should have viewed facts in light of video evidence rather than the plaintiff's allegations where the video so "utterly discredited" the plaintiff's allegations that "no reasonable jury could have believed him"). A court may also consider matters of which it may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A court may judicially notice a fact that is "not subject to reasonable dispute" because it is either (1) generally known within the trial court's territorial jurisdiction or (2) capable of accurate and ready determination by resort to sources whose accuracy "cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also Whitaker v. Collier*, 862 F.3d 490, 496 n.10 (5th Cir. 2017).

## III. DISCUSSION

### A. Scott's Claims against White

On the morning of February 20, 2015, White was responding to a report of a suspicious person identified as a black female when he drove past Scott, a white male, on the sidewalk of Wheless Lane in Austin, Texas. (Second Am. Compl., Dkt. 15, at 3–4). White pulled over, exited his car, and approached Scott. (*Id.* at 4). White asked Scott for identification, and Scott responded that he was homeless and that he had just arrived in Austin. (Dashcam Video, Dkt. 15 Ex. A, at 0:50–55). He asked Scott whether he was with a black female and repeated his request for identification; Scott responded that he was alone and that he did not have identification. (*Id.* at 0:50–1:15). White asked Scott if he had been arrested before, and Scott said that he had. (*Id.* at 1:15–20). White asked Scott what he had been arrested for; Scott did not answer. (*Id.* at 1:20–25). White then asked Scott for his name several times, but Scott stood silently without responding. (*Id.* at 1:25–50).

At that point, White asked Scott if he had any weapons, which Scott denied. (*Id.* at 1:50–56). White then reached out, grabbed Scott's left wrist, and instructed him to drop whatever was

enclosed in his right fist as Scott stood facing him. (*Id.* at 1:56). Scott did not drop the item in his right hand;[1] White, still holding Scott's left wrist, repeated his command to put the item down several times. (*Id.* at 1:57–2:01). The following exchange then occurred:

Scott: "Will you please stop?"

White: "Put it down."

Scott: "Why are you touching me right now?"

White: "Listen to me."

Scott: "Stop. Why are you touching me?"

White: "You need to stop."

Scott: "Stop. You're hurting my hand."

White: "Put your hands behind your back."

Scott: "Ow. You're hurting my hand."

White: "Put your hands behind your back."

Scott: "Why?"

White: "Put your hands behind your back."

Scott: "Why?!"

(*Id.* at 2:01–15). White then struck Scott in the head with his elbow and took him to the ground. (*Id.* at 2:15–20). For about twenty seconds, Scott twisted and turned underneath White as the officer punched, elbowed, and kneed him in the head repeatedly. (*Id.* at 2:20–45). White commanded Scott several times to put his hands behind his back; Scott covered his head with his hands. (*Id.*). White then drew his electronic control weapon ("ECW") and applied it to Scott. (*Id.* at 2:45–48).

---

[1] White later described that item as a circular silver object that resembled a "miniature hub cap." (Dashcam Video, Dkt. 15 Ex. A, at 16:14–45).

What happened next is disputed. White alleges that Scott "disarmed Sgt. White, refused commands to let go of the taser, and tased and broke Sgt. White's hand." (Mot. J. Plead., Dkt. 40, at 3). Although White characterizes these as "undisputed facts," (*id.* at 2), they are neither conceded by Scott's complaint nor so clear from the video evidence attached to Scott's complaint that the Court must favor them over Scott's allegations. The video does appear to show the two men struggling for control of White's left hand, with which he appeared to draw his ECW. (*Id.* at 2:48–55). White can be heard yelling, "Let go of my Taser." (*Id.* at 3:08).

However, the video does not clearly show Scott's possession of the ECW, nor does it clearly show Scott applying the ECW to White. (*Id.* at 2:48–3:18). White continuously had dominant position on Scott, pressing Scott against the sidewalk with his body weight as Scott writhed around underneath him. (*Id.*). From the moment White first used his ECW on Scott until Scott was finally subdued, White was able to punch or knee Scott on or near the head nine more times. (*Id.*). It may be true that Scott deployed White's ECW against him, but the video does not so utterly discredit Scott's pleadings, which do not concede that he stole or used White's ECW, that the Court can find that fact at this stage in the litigation.

Moreover, the video does not clearly establish that Scott "broke Sgt. White's hand." (Mot. J. Plead., Dkt. 40, at 3). White's dashcam video captured his interactions with the other officers who arrived on the scene after the incident. White told a technician inspecting the officer's injuries that "I think I broke my hand on him." (Dashcam Video, Dkt. 15 Ex. A, at 13:44–47). Later, White told two other officers, "I think I broke my hand." (*Id.* at 17:13). "What'd you do?" asked one of the other officers. (*Id.* at 17:15). "I was punching the shit out of him," White responded. (*Id.* at 17:17). Because the video does not utterly discredit Scott's pleadings, which do not concede that Scott broke White's hand, the Court cannot find that fact at this stage in the litigation.

Scott alleges that he was taken to Brackenridge Hospital to treat his injuries after the incident. (Second Am. Compl., Dkt. 15, at 5). Scott alleges that he "suffered and suffers from physical injuries, extreme psychological injuries, mental anguish, humiliation, trauma, and the indignity" of being beaten by a law enforcement officer. (*Id.*). Scott alleges that White caused him "significant physical pain" and that his damages "are most probably in excess of a million dollars." (*Id.* at 18).

Out of these facts, Scott asserts several Section 1983 claims against White. First, Scott asserts a claim for the violation of his Fourth Amendment right to be free from unreasonable search (the "illegal search claim"). (*Id.* at 8–9). Second, Scott asserts a claim for the violation of his Fourteenth Amendment right to due process (the "due process claim"). (*Id.* at 9–10). Third, Scott asserts a claim for the violation of his Fourth Amendment right to be free from the use of excessive force (the "excessive force claim"). (*Id.* at 10–11). Finally, Scott asserts a claim for the violation of his Fourth Amendment right to be free from unreasonable seizure (the "false arrest claim"). (*Id.* at 11–13). White argues that each claim should be dismissed pursuant to Rule 12(c). (Mot. J. Plead., Dkt. 40, at 6–7). White also generally asserts qualified immunity with respect to Scott's Section 1983 claims. (Second Am. Answer, Dkt. 24, at 3).

## 1. The Illegal Search, False Arrest, and Due Process Claims

White argues that Scott's illegal search, false arrest, and due process claims should be dismissed pursuant to the independent intermediary doctrine because a magistrate and a grand jury found probable cause to support Scott's arrest. (Mot. J. Plead., Dkt. 40, at 7–9). White asks the Court to take judicial notice of arrest warrants issued by a Travis County magistrate for assaulting a peace officer and taking or attempting to take a weapon from a peace officer. (Arrest Warrants, Dkt. 40 Ex. 1, at 19–22). Citing *Taylor v. Charter Medical Corp.*, 162 F.3d 827, 831 (5th Cir. 1998), Scott

argues that the Court cannot take judicial notice "of another court's legal determination." (Resp. Mot. J. Plead., Dkt. 54, at 7). But taking notice of the fact that a magistrate issued arrest warrants based on probable cause is not the same thing as taking notice that probable cause existed to support Scott's arrest based on the magistrate's determination, which is what *Taylor* proscribes. Indeed, district courts in this circuit have taken judicial notice of arrest warrants for the purpose of deciding motions to dismiss under Rule 12(b)(6). *See Shepherd v. Fanning*, No. CV 17-2694, 2017 WL 2671706, at *2 n.1 (E.D. La. June 21, 2017); *LeBlanc v. City of Haltom City*, No. 4:10-CV-812-A, 2011 WL 2149908, at *4 n.3 (N.D. Tex. May 31, 2011).

The Fourth and Fourteenth Amendments guard against arrest without probable cause. *Hand v. Gary*, 838 F.2d 1420, 1427 (5th Cir. 1988). However, if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party from liability. *Deville v. Marcantel*, 567 F.3d 156, 170 (5th Cir. 2009). The independent intermediary rule applies even if the independent intermediary's action occurred after the arrest, and even if the arrestee was never convicted of any crime. *Buehler v. City of Austin/Austin Police Dep't.*, 824 F.3d 548, 555 (5th Cir. 2016).

However, the arresting officer may nonetheless be liable for false arrest "if the plaintiff shows that the deliberations of that intermediary were in some way tainted by the actions" of the officer. *McLin v. Ard*, 866 F.3d 682, 689 (5th Cir. 2017) (citation and quotation marks omitted). But because the intermediary's deliberations protect even officers with malicious intent, a plaintiff must show that the officer's malicious motive "led the official to withhold relevant information or otherwise misdirect the independent intermediary by omission or commission." *Buehler*, 824 F.3d at 555 (citation and quotation marks omitted). To implicate the taint exception, omissions of exculpatory information must be knowing. *Id.* (citation and quotation marks omitted).

Here, the magistrate's issuance of two arrest warrants for Scott based upon probable cause, (Arrest Warrants, Dkt. 40 Ex. 1, at 19–22), shields White from liability for false arrest. Scott argues that the taint exception applies because a different officer—Officer Edwards—made knowing misrepresentations to the magistrate in his affidavit seeking the arrest warrant. (Resp. Mot. J. Plead., Dkt. 54, at 8–9). However, Scott's complaint is devoid of allegations that *White* knowingly tainted the magistrate's deliberation through willful misrepresentations or omissions. (*See, e.g.*, Second Am. Compl., Dkt. 15, at 11–12). Because an independent intermediary issued an arrest warrant in this case, Scott's burden to plead facts to state a plausible claim for false arrest includes the burden to plead facts to support a finding that White's conduct supports applying the taint exception. *McLin*, 866 F.3d at 690–91. Because he has failed to do so, the Court must dismiss his false arrest claim.

However, despite arguing that the independent intermediary doctrine requires dismissal of Scott's illegal search and due process claims, White cites no authority to demonstrate that the doctrine applies to either claim. Moreover, White fails to explain how a magistrate's finding of probable cause to arrest Scott for resisting arrest and taking an officer's weapon could vitiate a stop and search that occurred prior to any resistance for which the warrants were issued. Accordingly, the Court will deny White's request that the Court dismiss either claim on that basis.

White does argue that Scott's due process claim is vague, (Mot. J. Plead., Dkt. 40, at 8), which the Court will construe as a motion for a more definite statement under Federal Rule of Civil Procedure 12(e) and grant. Scott does not specify which of White's actions constituted an arbitrary government action depriving him of his rights to due process of law under the Fourteenth Amendment.

## 2. The Excessive Force Claim

White argues that (1) Scott fails to adequately plead an excessive force claim against him, and that (2) he is entitled to qualified immunity. (*Id.* at 9–12). The Fourth Amendment creates a "right to be free from excessive force during a seizure." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012). To prove an excessive force claim, Scott must show that "in addition to being seized, he suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 846 (5th Cir. 2009) (citation and quotation marks omitted). A plaintiff must allege more than a *de minimis* injury to support an excessive force claim. *Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005). In determining whether an injury caused by excessive force is more than *de minimis*, courts look to the context in which that force was deployed. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999), *decision clarified on reh'g*, 186 F.3d 633 (5th Cir. 1999). "Any force found to be objectively unreasonable necessarily exceeds the *de minimis* threshold, and, conversely, objectively reasonable force will result in *de minimis* injuries only." *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (citation and quotation marks omitted). Stated differently, "as long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Id.* (quoting *Brown v. Lynch*, 524 Fed. App'x. 69, 79 (5th Cir. 2013)).

White argues that Scott's excessive force claim fails as a matter of law because Scott failed to plead more than a *de minimis* injury. (Mot J. Plead., Dkt. 40, at 10–11). According to White, Scott's "bald allegation that he 'suffered multiple injuries'" and a general request for "actual damages" do not suffice to plead more than *de minimis* injury. (*Id.* at 10). White argues that Scott must plead his injuries with "sufficient specificity to meet his burden to show more *de minimis* injury." (*Id.*).

White's position misunderstands the analysis of a plaintiff's pleadings with respect to the injury prong of an excessive force claim. The sufficiency of a plaintiff's injury turns not on the severity of the injury, but on the reasonableness of the officer's use of force. If the use of force is unreasonable, then "even relatively insignificant injuries and purely psychological injuries will prove cognizable." *Alexander*, 854 F.3d at 309. The question is not, therefore, whether Scott has plausibly alleged some injury; he has. (*See* Second Am. Compl., Dkt. 15, at 11 (alleging that White's use of force "caused such severe injuries that Mr. Scott required emergency medical treatment"); *id.* at 4 ("Plaintiff suffered and suffers from physical injuries, extreme psychological injuries, mental anguish, humiliation, and trauma"); *id.* at 18 (alleging that Scott suffers from "significant physical pain" and that his damages exceed one million dollars)). The question is whether Scott has plausibly alleged that White's use of force was unreasonable.

"Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville*, 567 F.3d at 167 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "Factors to consider include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396).

The reasonableness of an officer's conduct is judged objectively without reference to the officer's intent or motivation. *Graham*, 490 U.S. at 397. Courts must look at the facts and circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Courts must also account for the difficult and often split-second decisions that police officers must make in carrying out their duties. *Id.* at 396–97.

Describing White's use of force, Scott alleges that White "cold-cocked Plaintiff's head with his elbow," "violently punch[ed], elbow[ed], Taser[ed], and knee[d]" Scott, and "threw Mr. Scott to the pavement and violently st[r]uck him repeatedly in the head, neck, and body." (Second Am. Compl., Dkt. 15, at 4). The video attached to Scott's second amended complaint shows White deploying his ECW against Scott and striking Scott at least a dozen times with his fist, elbow, or knee—often in the face or head—while Scott is pinned beneath him on a paved sidewalk. (Dashcam Video, Dkt. 15 Ex. A, at 2:15–3:30).

White defends his use of force differently based on the stage of the encounter. With respect to his initial use of force, in which he elbowed Scott in the head and took him to the ground, White argues that he was justified in doing so by Scott's noncompliance. (*See* Reply Mot. J. Plead., Dkt. 58, at 7 ("Plaintiff refused to drop the object in his right hand after repeated verbal commands raising officer safety concerns[.] Sgt. White used control techniques to protect himself against the unidentified object and gain compliance, but Plaintiff escalated until Sgt. White was forced to defend himself.")). Applying the *Graham* factors, the Court finds that Scott has plausibly alleged that White's initial use of force was unreasonable. Scott alleges that he had not given White reasonable suspicion to believe he had committed a crime. (Second Am. Compl., Dkt. 15, at 4). The video shows Scott standing still on an otherwise empty street when White first struck him and tackled him. (Dashcam Video, Dkt. 15 Ex. A, at 2:10–20). While failure to comply with an officer's instructions might justify the use of physical force, *Deville*, 567 F.3d at 167, Scott's pleadings—considered in light of the video evidence—are sufficient to plausibly allege that White's initial use of force was unreasonable. *See Trammell v. Fruge*, 868 F.3d 332, 343 (5th Cir. 2017).

With respect to White's uses of force once Scott was on the ground, White argues that he "ended up in a fight for his life once Plaintiff disarmed him of his taser" because Scott could have

incapacitated White, taken his gun, and shot him. (Reply Mot. J. Plead., Dkt. 58, at 8). Here, the video shows that Scott refused to comply with White's commands and resisted arrest by writhing around underneath White instead of lying still so he could be handcuffed.[2] Resisting arrest does not necessarily justify any use of force. *See Trammell*, 868 F.3d at 341–42 (holding that a reasonable jury could conclude that an officer's use of force was excessive where the plaintiff resisted by pulling his arm away from the officer); *Ramirez v. Martinez*, 716 F.3d 369, 376–79 (5th Cir. 2013) (same); *Goodson v. City of Corpus Christi*, 202 F.3d 730, 734, 740 (5th Cir. 2000) (same). Scott alleges that White grabbed his arm "without provocation" and that he made no "threatening statements or movements" before White first struck him. (Second Am. Compl., Dkt. 15, at 4). After White took Scott to the ground, the video shows that Scott ignored White's commands while twisting and turning underneath White and covering his head with his hands as White punched, elbowed, and kneed his head. (Dashcam Video, Dkt. 15 Ex. A, at 2:15–45). After White deployed his ECW against Scott, the video shows Scott grabbing White's left hand and continuing to twist and turn underneath White as White delivered another series of strikes. (*Id.* at 2:45–3:20). Scott's pleadings do not concede that he was committing a crime, posing a danger to White or others, or resisting or evade arrest. (Second Am. Compl., Dkt 15, at 4–5). Although the video shows Scott physically resisting White's commands, it is not such conclusive evidence in White's favor that no reasonable jury could find that his use of force after he took Scott to the ground was unreasonable under the *Graham* factors. Scott's pleadings—considered in light of the video evidence—are therefore sufficient to plausibly allege that White's continued uses of force after taking Scott to the ground was unreasonable.

---

[2] With respect to White's claim that Scott disarmed him of his ECW, the video evidence appears to show the two men struggling for the object in White's left hand but does not provide "so much clarity" in support of White's version of events that the court should discount Scott's pleadings, which do not allege that he disarmed White. *Darden*, 880 F.3d at 730.

### 3. Qualified Immunity

"The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011). There are two steps to determining whether a defendant is protected by qualified immunity. *Saucier v. Katz*, 533 U.S. 194 (2001). First, the court asks whether the official "violated a statutory or constitutional right." *Morgan*, 659 F.3d at 371 (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)). Second, the court asks whether "the right was 'clearly established' at the time of the challenged conduct." *Id.* (quoting *al-Kidd*, 131 S. Ct. at 2083). Courts have the discretion to decide the order in which to answer these two prongs. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 136 S. Ct. at 308 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). While there need not be "a case directly on point . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011)).

In the context of a pretrial motion, the Court must determine whether an officer is entitled to qualified immunity in light of the applicable standard of review. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014) (holding that at summary judgment, a court cannot resolve fact disputes pertaining to either prong of qualified immunity in favor of the moving party as "an application of the more general rule" governing the "judge's function" at summary judgment); *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (stating that courts should evaluate qualified immunity based on the defendant's conduct "as alleged in the complaint" at the motion to dismiss stage). The fundamental question, then, is whether—based on Scott's allegations to the extent they are not

utterly discredited by the video evidence attached to his complaint—it is plausible that White would have had "fair notice" that his actions were unreasonable. *Hope v. Pelzer*, 536 U.S. 730, 740 (2002).

When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense. *McClendon*, 305 F.3d at 323. In order to shift the burden to the plaintiff, "[t]he defendant official must initially plead his good faith and establish that he was acting within the scope of his discretionary authority." *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992). Fifth Circuit precedent suggests that a defendant can invoke qualified immunity by pleading good faith and scope-of-authority in substance. *See Saenz v. Flores*, 668 F. App'x 611, 612 (5th Cir. 2016) (finding that the defendant had invoked qualified immunity by stating that he was acting in the scope of his employment, that he was in a "position of interdependence," and that he was entitled to qualified immunity). Here, White asserts "qualified/official immunity for employee actions taken in the court and scope of employment." (Second Am. Answer, Dkt. 24, at 3). This blanket assertion is sufficient to shift the burden to Scott to identify plausible allegations that White's conduct violated a constitutional right and to demonstrate that the right was clearly established at the time of the conduct. *Lincoln v. Turner*, 874 F.3d 833, 847–48 (5th Cir. 2017).

Scott argues that his rights to be free from excessive force, warrantless and unreasonable arrest, and unreasonable restraint under the Fourteenth Amendment's Due Process Clause were all clearly established at the time of the incident. (Resp. Mot. J. Plead., Dkt. 54, at 15–17). However, Scott offers no argument that White's stop and search violated clearly established law. (*See id.*). Because Scott failed to meet his burden to cite clearly established law demonstrating that White is not entitled to qualified immunity with respect to Scott's illegal search claim, the Court must find that White is entitled to qualified immunity on that claim. Because the Court dismisses Scott's false arrest claim on other grounds and orders Scott to file a more definite statement of his due process

claim, *see supra* at Section III.A.1, at it will not analyze whether White is entitled to qualified immunity on those claims.

As for Scott's excessive force claim, Scott argues that he had a "clearly established right to be free from excessive force." (Resp. Mot. J. Plead., Dkt. 54, at 15 (citing *Graham*, 490 U.S. at 393–94)). Scott argues that White violated that right by "punching him in the head, pushing him, kneeing him, pummeling him[,] and tasing him," (Resp. Mot. J. Plead., Dkt. 54, at 16–17), even though Scott was "unarmed," "nonviolent," and had not given White reason to believe he had committed a crime, (*id.* at 15–16).

The Court has already found that Scott has plausibly alleged that White's use of force—both before and after taking Scott to the ground—violated Scott's constitutional right to be free from excessive force. (*See supra* at Section III.A.2). The question then is whether Scott has met his burden to show that his right to be free from excessive force in these circumstances was clearly established before February 20, 2015. The Court finds that he has.

Regarding White's use of force before taking Scott to the ground, it is clearly established law in the Fifth Circuit that it is objectively unreasonable for an officer to strike a person who is "not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp." *Trammell*, 868 F.3d at 343 (stating that such law was clearly established before January 2013); *see also Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017) (holding that as of February 2013, "clearly established law demonstrated that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation."). White's initial use of force—as alleged in Scott's

second amended complaint and considered in light of the video—violates this clearly established law.

As for White's uses of force after taking Scott to the ground, it is true that the video shows Scott resisting his commands by twisting and turning underneath White, and at times grabbing White's hands, rather than submitting to being handcuffed. (Dashcam Video, Dkt. 15 Ex. A, at 2:15–3:20). Absent justification, Scott's resistance is such that no clearly established law would have given White fair notice that his uses of force after taking Scott to the ground were unlawful. *See Griggs v. Brewer*, 841 F.3d 308, 315 (5th Cir. 2016) (holding that "no settled authority" put an officer on notice that it was unconstitutional to put his weight on top of a person on the ground and use "non-deadly punches" to gain control of the person's arms).

However, clearly established Texas law justifies the use of force to resist arrest if, before the person resists, the peace officer uses "greater force than necessary" to make the arrest and the person believes their use of force is "immediately necessary to protect himself" against the officer's use of force. TEX. PENAL CODE 9.31(c). Justified resistance under state law does not constitute resistance for the purposes of analyzing the constitutionality of an officer's use of force. To conclude otherwise would lead to the absurd result that a person's lawful response to an officer's unconstitutional use of force would render the officer's subsequent uses of force constitutional.

Here, Scott alleges that he resisted only after White used greater force than necessary to arrest him, (*See* Second Am. Compl., Dkt. 15, at 4 (alleging that White struck Scott "without provocation" and that Scott had made no "threatening statements or movements" before White's first strike)), and a reasonable jury could conclude from the video that Scott used no more force than was immediately necessary to protect himself from White's continued uses of force. Taking the facts as alleged to the extent they are not utterly discredited by the video evidence attached to Scott's

complaint, a reasonable officer in White's position would have known that Scott's resistance to White's uses of force after striking Scott in the head and tackling him were justified under Texas law. Armed with the knowledge that Scott's physical resistance was justified, the clearly established law described in *Trammell* and *Hanks* is sufficient to give a reasonable officer in White's position fair notice that it is excessive to continue to punch, knee, and deploy an ECW against a person who was otherwise not fleeing, violent, or aggressive prior to the initial use of force.

### B. Scott's claims against the City

Scott's claims against the City can be summarized as follows. First, Scott claims that the City has a custom or practice of failing to discipline or fire officers who violate the City's use of force policies ("the custom claim"). (Second Am. Compl., Dkt. 15, at 14). Second, Scott claims that the City fails to adequately train its officers to use appropriate force (the "training claim"). (*Id.* at 15). Third, Scott claims that the City fails to adequately supervise its officers' use of force (the "supervision claim"). (*Id.*). The City argues that each of these claims should be dismissed. (Mot. J. Plead., Dkt. 40, at 13–16).

### 1. The Custom Claim

To hold a municipality liable under Section 1983 for the misconduct of an employee, "a plaintiff must show, in addition to a constitutional violation, that an official policy promulgated by the municipality's policymaker was the moving force behind, or actual cause of, the constitutional injury." *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009). "The official policy itself must be unconstitutional or, if not, must have been adopted with deliberate indifference to the known or obvious fact that such constitutional violations would result." *Id.* (citation and quotation marks omitted). Although a policy can exist in the form of written policy statements or regulations, it "may also arise in the form of a widespread practice that is so common and well-settled as to constitute a

custom that fairly represents municipal policy." *Id.* (citation and quotation marks omitted). A policy is official only "when it results from the decision or acquiescence of the municipal officer or body with final policymaking authority over the subject matter of the offending policy." *Id.* (citation and quotation marks omitted).

Scott argues that the City "has a custom or practice that allows Officer White and other officers to remain an officer." (Second Am. Compl., Dkt. 15, at 14). Scott alleges that White has had "prior use of force issues" that violate the City's policies against excessive uses of force, but that White was not disciplined for this or other incidents that allegedly violate the City's use-of-force ("UOF") policy. (*Id.* at 6–7). Scott alleges that four other officers have violated the City's UOF policy since 2011 but were not disciplined. (*Id.* at 8). According to Scott, this is evidence of a custom in which APD officers are "placed in recurring situations in which" they violate people's Fourth and Fourteenth Amendment rights. (*Id.* at 16). Scott alleges that this custom flows from APD's chief and that the custom is the product of deliberate indifference to the risk of rights deprivations. (*Id.*).

The City argues that Scott's allegations are too conclusory, (Mot. J. Plead., Dkt. 40, at 13), but the Court disagrees. Scott does not merely allege that the City has a policy or custom of permitting officers to use excessive force with impunity; rather, he identifies five discrete instances of alleged excessive uses of force and alleges that officers were not disciplined pursuant to a departmental custom. (Second Am. Compl., Dkt. 15, at 4–8); *compare Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997) (holding that the allegation that the defendant "operate[d] in a manner of total disregard for the rights of African American citizens" was conclusory). The more salient defect, as the City points out, is that Scott alleges too few instances of conduct to plausibly allege such widespread practice that it could be said to represent municipal policy. *See Prince v. Curry*,

423 F. App'x 447, 451 (5th Cir. 2011) (holding that the alleged existence of at most two other similar actions was insufficient to plausibly allege a policy or custom).

Of course, even a single decision by a decisionmaker with final authority—as Scott alleges the APD chief to be, (Second Am. Compl., Dkt. 15, at 13–14)—can trigger municipal liability. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). However, that single decision must be a direct cause of the alleged constitutional violation. *James*, 577 F.3d at 617. Here, Scott does not allege that the APD chief's decision not to discipline White for this or other prior uses of force was a direct cause of the allegedly excessive force used here. Indeed, it is unclear how a decision not to discipline White could directly cause the complained-of conduct at issue here—the failure to discipline White for prior uses of force would be at most an indirect cause of this use of force, and the failure to discipline White after this use of force could not have caused this use of force because it had already occurred. The Court will therefore dismiss this claim.

### 2. The Training and Supervision Claims

The failure to train can amount to a policy if there is "deliberate indifference to an obvious need for training where citizens are likely to lose their constitutional rights on account of novices in law enforcement." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 849 (5th Cir. 2009). To hold a municipality liable for failure to train an officer, "it must have been obvious that the highly predictable consequence of not training its officers was that they would apply force in such a way that the Fourth Amendment rights of citizens were at risk." *Id.* (citation and quotation marks omitted). The same deliberate indifference standard applies to failure-to-supervise claims. *Id.* at 850. To satisfy the deliberate indifference standard, "a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training"—or supervision—"is obvious and obviously likely to result in a constitutional violation." *Estate of Davis ex rel. McCully v. City of N. Richland Hills,*

406 F.3d 375, 381 (5th Cir. 2005). The pattern of violations must be "fairly similar to what ultimately transpired" in the instant case. *Id.* at 383. Here, Scott alleges four incidents of allegedly excessive force that occurred over the four years prior to the incident at issue in this case: (1) an incident in which White shot a man in the face while he was holding a BB gun; (2) two officers punching and tasing a man; (3) an officer using a chokehold on a man; and (4) an officer repeatedly punching a man in the face without provocation. (Second Am. Compl., Dkt. 15, at 7–8). Only three of these prior incidents bear an even superficial resemblance to the events alleged in this case. Three incidents in four years is insufficient to plausibly allege a training or supervision failure that would make it obvious that any one officer would be a highly predictable risk to use excessive force. The Court will therefore grant the City's motion to dismiss Scott's failure-to-train and failure-to-supervise claims.

## IV. LEAVE TO AMEND

Scott has already amended his complaint twice, each time in response to a motion to dismiss. (See First Am. Compl., Dkt. 11; Second Am. Compl., Dkt. 15). Defendants raised the independent-intermediary issue for the first time in the instant motion. (*See* First Mot. Dismiss, Dkt. 9; Second Mot. Dismiss, Dkt. 12). However, Defendants have twice argued that Scott's municipal liability claims should be dismissed pursuant to Rule 12(b)(6), (*id.*), and Scott twice amended his complaint to modify his complaint with respect to his municipal liability claims. Although Rule 15 "evinces a bias in favor of granting leave to amend," *Lyn–Lea Travel Corp. v. Am. Airlines*, 283 F.3d 282, 286 (5th Cir. 2002), the Court may dismiss an action with prejudice without giving an opportunity to amend if it finds that the plaintiff has already alleged his or her best case. *See Jones v. Greninger*, 188 F.3d 322, 327 (5th Cir. 1999) (citing with approval the proposition that "a district court does not err in dismissing a . . . complaint with prejudice if the court determines the plaintiff has alleged his best

case"). Because Scott has not amended his complaint with respect to his false arrest claim, the Court will dismiss that claim without prejudice. However, the Court finds that Scott has already alleged his best case with respect to his municipal liability claims in light of his repeated and ultimately unsuccessful efforts to amend those claims. The Court will dismiss those claims with prejudice.

## V. CONCLUSION

For the reasons stated above, **IT IS ORDERED** that Defendants' Rule 12(c) Motion for Judgment on the Pleadings, (Dkt. 40), is **GRANTED IN PART and DENIED IN PART.**

Specifically, Defendants' motion is **GRANTED** insofar as (1) Scott's false arrest claim against White is **DISMISSED WITHOUT PREJUDICE** and (2) Scott's illegal search claim against White and Scott's claims against the City are **DISMISSED WITH PREJUDICE**.

However, Defendants' motion is **DENIED** with respect to Scott's excessive force claim against White.

Finally, Scott is **ORDERED** to file a more definite statement of his due process claim against White within 14 days of receiving notice of this order.

**SIGNED** on April 30, 2018.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE