IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

JUSTIN SCOTT,                          §
                                       §
            Plaintiff,                 §
                                       §
v.                                     §            1:16-CV-1287-RP
                                       §
GREG WHITE and                         §
THE CITY OF AUSTIN,                    §
                                       §
            Defendants.                §

## ORDER

Before the Court are a number of related motions. First is a Motion for Judgment on the

Pleadings filed by Defendant Gregory White ("White"). (Dkt. 66). Second are two motions to

exclude the opinions of Plaintiff Justin Scott's ("Scott") experts. (Dkts. 74, 80). Third is a motion for

summary judgment filed by White. (Dkt. 82). Fourth is a motion to strike Scott's response to

White's motion for summary judgment. (Dkt. 88). Finally, there is Scott's motion for additional time

to respond to White's motion for summary judgment. (Dkt. 90). Because the motions are

interrelated, the Court will decide them together in this order.

## I. BACKGROUND

This case concerns an investigatory stop, use of force, and arrest by White, an Austin Police

Department ("APD") officer, on February 20, 2015. (3d Am. Compl., Dkt. 64, at 3). Scott alleges

that White stopped him without reasonable suspicion, attacked him without provocation, used

excessive force to subdue him, and then arrested him without probable cause. (*Id.* at 3–9). This

action has already seen significant litigation of the pleadings. That litigation has led Scott to amend

his complaint three times: once as a matter of right, (Dkt. 11), and twice more with leave, (Dkts. 15,

64).

Scott's second amended complaint contained several causes of action against White pursuant to 42 U.S.C. § 1983 ("Section 1983") for violations of his rights under the United States Constitution. (2d Am. Compl., Dkt. 15, at 8–13). First, Scott claimed that White violated his Fourth Amendment right to be free from unreasonable search (the "illegal search claim"). (*Id.* at 8–9). Second, Scott claimed that White violated his Fourteenth Amendment right to due process (the "due process claim"). (*Id.* at 9–10). Third, Scott claimed that White violated his Fourth Amendment right to be free from the use of excessive force (the "excessive force claim"). (*Id.* at 10–11). Finally, Scott claimed that White violated Fourth Amendment right to be free from unreasonable seizure (the "false arrest claim"). (*Id.* at 11–13). White filed a motion for judgment on the pleadings, arguing that each claim should be dismissed pursuant to Rule 12(c). (1st Mot. J. Plead., Dkt. 40, at 6–7).

In his second amended complaint, Scott also asserted a Section 1983 claim against Defendant City of Austin ("the City") based on an alleged policy and practice of permitting the use of excessive force and an alleged failure to adequately train or supervise its officers. (2d Am. Compl., Dkt. 15, at 5–8; 13–17). The City likewise asked for judgment on the pleadings, arguing that Scott's claim against it should be dismissed pursuant to Rule 12(c). (1st Mot. J. Plead., Dkt. 40, at 6–7).

In resolving Defendants' 12(c) motion, the Court dismissed several claims with prejudice: Scott's illegal search claim against White and all of his claims against the City. *Scott v. White*, 1:16-CV-1287-RP, 2018 WL 2014093, at *10 (W.D. Tex. Apr. 30, 2018). The Court dismissed Scott's false arrest claim against White without prejudice and granted him leave to amend that claim. *Id.* at *9–10. The Court ordered Scott to file a more definite statement of his due process claim against White. *Id.* at *10. Finally, the Court denied White's motion as it pertained to Scott's excessive force claim. *Id.*

Following that order, Scott amended his complaint a third time. Scott's third amended complaint contains all of the same causes of action asserted against White in his second amended

complaint: an illegal search claim, (3d Am. Compl., Dkt. 64, at 9–10, 15); a due process claim, (*id.* at 10–14); an excessive force claim, (*id.* at 14–16); and a false arrest claim, (*id.*). Additionally, Scott's third amended complaint contains the same causes of action against the City that he asserted in his second amended complaint. (*Compare id.* at 17–20, *with* 2d Am. Compl., Dkt. 15, at 13–17).

White's pending motion for judgment on the pleadings, his second, seeks dismissal of Scott's due process and false arrest claims under Federal Rule of Civil Procedure 12(c). (2d Mot. J. Plead., Dkt. 66, at 5–9). White's motion for summary judgment seeks judgment on Scott's excessive force claim. (Mot. Summ. J., Dkt. 82, at 13–22). White has asserted qualified immunity for all of Scott's Section 1983 claims. (Third Am. Answer, Dkt. 65, at 4).[1]

## II. STRIKING DISMISSED CLAIMS

Neither White nor the City ask the Court to strike from Scott's third amended complaint the claims previously dismissed with prejudice—namely, Scott's illegal search claim against White and Scott's claims against the City. *Scott*, 2018 WL 2014093, at *10. A Court may strike any immaterial matter from a pleading *sua sponte*. Fed. R. Civ. P. 12(f). Because these claims have been dismissed with prejudice, Scott's assertions of these claims in his third amended complaint are immaterial to this litigation. The Court therefore strikes them from Scott's third amended complaint *sua sponte*. Only Scott's false arrest, due process, and excessive force claims against White remain.

## III. MOTION FOR JUDGMENT ON THE PLEADINGS

In his pending motion for judgment on the pleadings, White seeks dismissal of Scott's due process and false arrest claims under Federal Rule of Civil Procedure 12(c). (2d Mot. J. Plead., Dkt. 66, at 5–9). Scott responded, and White replied. (Dks. 67, 68). Having considered the parties'

---

[1] White labels his third amended answer "Second Amended Answer," (Dkt. 65, at 1), but it is his third. (*See* Dkts. 13, 17). The Court will therefore refer to this pleading as White's third amended answer.

arguments, the evidence, and the relevant law, the Court finds that White's motion should be granted.

### A. Legal Standard

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) "is subject to the same standards as a motion to dismiss under Rule 12(b)(6)." *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 209–10 (5th Cir. 2010). Dismissal under Rule 12(b)(6) is appropriate only if the complaint fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To satisfy this standard, the complaint must provide more than conclusions, but it "need not contain detailed factual allegations." *Colony Ins. Co. v. Peachtree Const., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011). It must, however, allege enough facts to move the claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Determining whether the plausibility standard has been met is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Rule 12(b)(6) motions are "viewed with disfavor and . . . rarely granted." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (citation and quotation marks omitted).

In deciding a motion to dismiss, a court may consider video evidence attached as an exhibit to the complaint; when doing so, "the court is not required to favor plaintiff's allegations over the video evidence." *Hartman v. Walker*, 685 F. App'x 366, 368 (5th Cir. 2017). That said, the standard for adopting video evidence over a plaintiff's allegations "is a demanding one: a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account." *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 730 (5th Cir. 2018); *see also Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (holding that the court should have viewed facts in light of video evidence rather than the plaintiff's allegations where the video so

"utterly discredited" the plaintiff's allegations that "no reasonable jury could have believed him"). A court may also consider documents attached to the complaint, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). A court may judicially notice a fact that is "not subject to reasonable dispute" because it is either (1) generally known within the trial court's territorial jurisdiction or (2) capable of accurate and ready determination by resort to sources whose accuracy "cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also Whitaker v. Collier*, 862 F.3d 490, 496 n.10 (5th Cir. 2017).

### B. *Scott's False Arrest Claim*

Scott included a false arrest claim in his second amended complaint, (2d Am. Compl., Dkt. 15, at 8–13), and the Court dismissed it under Rule 12(c) without prejudice, *Scott*, 2018 WL 2014093, at *10. The Court did so because Scott's second amended complaint did not plead facts to plausibly claim that the taint exception to the independent intermediary doctrine applied. *Id.* at *4. The Court gave Scott the chance to amend his pleading on this claim. *Id.* at *9. White now argues that the false arrest claim in Scott's third amended complaint should be dismissed because he did not amend his false arrest claim. (2d Mot. J. Plead., Dkt. 66, at 9).[2] White's claim is inaccurate; Scott added allegations relevant to the independent intermediary exception. (3d Am. Compl., Dkt. 64, ¶¶ 4.16–4.21). The question is whether these new allegations suffice to state a plausible claim for relief.

The Fourth Amendment guards against arrest without probable cause. *Hand v. Gary*, 838 F.2d 1420, 1427 (5th Cir. 1988). However, if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party from liability. *Deville v. Marcantel*, 567

---

[2] White offers additional arguments in his reply, but arguments raised for the first time in a reply brief are waived. *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010).

F.3d 156, 170 (5th Cir. 2009). The independent intermediary rule applies even if the independent intermediary's action occurred after the arrest, and even if the arrestee was never convicted of any crime. *Buehler v. City of Austin/Austin Police Dep't.*, 824 F.3d 548, 555 (5th Cir. 2016). Such is the case here. (Arrest Warrants, Ex. B, Dkt. 64, at 26–29).

However, the arresting officer may nonetheless be liable for false arrest "if the plaintiff shows that the deliberations of that intermediary were in some way tainted by the actions" of the officer. *McLin v. Ard*, 866 F.3d 682, 689 (5th Cir. 2017) (citation and quotation marks omitted). "Any misdirection of the magistrate or the grand jury by omission or commission perpetuates the taint of the original official behavior." *Hand*, 838 F.2d at 1428. "[T]he chain of causation is broken only where all the facts are presented to the . . . independent intermediary[,] where the malicious motive of the law enforcement officials does not lead them to withhold any relevant information from the independent intermediary." *Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010) (citing *Hand*, 838 F.2d at 1427–28).[3]

White arrested Scott for assault on a peace officer and for taking or attempting to take a weapon from a peace officer. (Arrest Warrants, Ex. B, Dkt. 64, at 27, 29). Scott alleges that White arrested him without a warrant or probable cause. (3d Am. Compl., Dkt. 64, ¶¶ 7.7–7.9). White denies the allegations. (3d Am. Ans. Dkt. 65, at 3). The magistrate issued two arrest warrants for Scott based upon probable cause, (Arrest Warrants, Ex. B, Dkt. 64, at 26–29), placing the independent intermediary doctrine at issue. Scott argues that the doctrine does not apply because White tainted the decision of the magistrate who issued Scott's arrest warrants. (3d Am. Compl., Dkt. 64, ¶ 4.16; Resp. 2d Mot. J. Plead., Dkt. 67, at 3).

---

[3] Because the intermediary's deliberations protect even officers with malicious intent, a plaintiff must show that the officer's malicious motive "led the official to withhold relevant information or otherwise misdirect the independent intermediary by omission or commission." *Buehler*, 824 F.3d at 555 (citation and quotation marks omitted). To implicate the taint exception, omissions of exculpatory information must be knowing. *Id.* (citation and quotation marks omitted).

Scott's arrest warrants were issued based on affidavits prepared not by White but by a different officer, Charles Edwards ("Edwards"). (*Id.* at 27, 29). Scott alleges that White intentionally misrepresented the incident to Edwards, causing Edwards to misrepresent the incident in his affidavits. (3d Am. Compl., Dkt. 64, ¶¶ 4.16–4.21). Specifically, Scott alleges as follows. White told Edwards that a "suspicious person appeared to be burglarizing homes" when in fact White only had a report of a "suspicious person." (*Id.* ¶ 4.17). That suspicious person was described to White as a black woman; Scott is a white man. (*Id.* ¶ 4.18). White told Edwards that Scott "looked like he was about to run," when in fact he did not. (*Id.* ¶ 4.18). White told Edwards that "a struggle ensued" as he tried to handcuff Scott, when in fact White struck Scott in the head while Scott was doing no more than asking why White was touching him. (*Id.* ¶ 4.20). Scott alleges that because of these mischaracterizations, Edwards submitted an affidavit "replete with mischaracterizations," which caused the magistrate to issue the warrants without probable cause. (*Id.* ¶ 4.21).

Scott's allegations fail to state a plausible claim for relief. The magistrate issued arrest warrants for assault on a peace officer and for taking or attempting to take a weapon from a peace officer. (Arrest Warrants, Ex. B, Dkt. 64, at 27, 29). None of the alleged omissions or mischaracterizations cited in Scott's complaint are relevant to those charges; they pertain only to White's initial decision to stop Scott and to White's initial use of force. Because the alleged omissions or mischaracterizations cited in Scott's complaint are relevant to the charges for which the magistrate issued warrants for Scott's arrest, his allegations cannot show that the magistrate's deliberations were tainted by White's omissions or mischaracterizations. Scott's false arrest claim is dismissed under Rule 12(c). Scott has not asked for leave to further amend his complaint with respect to this claim, and the Court finds that he has alleged his best case. The Court will dismiss this claim with prejudice. *Jones v. Greninger*, 188 F.3d 322, 327 (5th Cir. 1999).

*C. Scott's Due Process Claim*

Scott included a due process claim in his second amended complaint, (2d Am. Compl., Dkt. 15, at 9–10), and the Court ordered him to file a more definite statement identifying which of White's actions gave rise to that claim, *Scott*, 2018 WL 2014093, at *4. In his third amended complaint, Scott makes clear that his due process claim is based on every one of White's allegedly wrongful actions: White "deprived [Scott] of his right to due process in that Plaintiff was wrongfully and without proper cause detained, arrested, and subjected to unreasonable and excessive force by [White]." (3d Am. Compl., Dkt. 64, ¶ 6.21; *see also id.* ¶¶ 6.5–6.6). White argues that Scott's due process claim should be dismissed because the Due Process Clause of the Fourteenth Amendment is the wrong vehicle for Scott's claim. (2d Mot. J. Plead., Dkt. 66, at 8–9). The Court agrees.

The right to be free from excessive force is protected by the Fourth Amendment, not the Fourteenth. *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against [the use of excessive force], that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."). Likewise, the right to be free from arrest unsupported by probable cause is protected under the Fourth Amendment, not the Fourteenth. *Cuadra*, 626 F.3d at 814 (citing *Albright v. Oliver*, 510 U.S. 266, 274 (1994)). The same is true of the right to be free from investigatory detention unsupported by reasonable suspicion. *Valencia v. Wiggins*, 981 F.2d 1440, 1444 (5th Cir. 1993). Because Scott does not allege that White violated any of his rights arising under the Due Process Clause of the Fourteenth Amendment, he fails to state a plausible claim for relief under Section 1983 based on a violation of his rights under that amendment. His due process claim is dismissed under Rule 12(c). Scott has not asked for leave to further amend his complaint with

respect to this claim, and the Court finds that he has alleged his best case. The Court will dismiss this claim with prejudice. *Jones*, 188 F.3d at 327.

## IV. EVIDENTIARY MOTIONS

White filed two motions to exclude the opinions and testimony of two of Scott's designated experts, Jo Kathryn Quinn ("Quinn") and Kimberly Bustos ("Bustos"). (Dkts. 74, 80). Because these motions concern the scope of evidence relevant to White's motion for summary judgment, the Court will resolve those motions before reaching White's summary judgment motion. For the reasons given below, the Court will grant White's motion regarding Quinn and deny White's motion regarding Bustos.

### A. *Motion to Exclude Opinions and Testimony of Jo Kathryn Quinn*

Quinn is the executive director of Caritas of Austin ("Caritas"), a nonprofit organization dedicated to reducing homelessness in Austin. (Quinn Decl., Dkt. 78-4). Scott designated Quinn as an expert "on issues pertaining to the homeless." (Silverman Email, Dkt. 78-1). White argues that the only timely submissions are her bio and resume, which do not establish that she is qualified to supply expert testimony in this case. (Mot. Exclude Quinn, Dkt. 74, at 2). Quinn later submitted an untimely report and declaration, (Dkts. 78-3, 78-4), which White asks the Court to disregard, (Reply Mot. Exclude Quinn, Dkt. 79, at 1–2).

The Court's scheduling order requires that the parties designate experts no later than October 1, 2018. (Dkt. 63, at 1–2). Because it does not appear that Scott has retained Quinn as an expert, her disclosure is governed by Rule 26(a)(2)(C), which requires that an expert witness report contain: (1) "the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705"; and (2) "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). Scott's timely disclosure does not meet the

second requirement. (*See* Dkts. 78-1, 78-2). Only Scott's supplemental disclosures, served to White on October 2 and October 25, summarize the facts and opinions to which Quinn is expected to testify. (See Dkts. 78-3, 78-4).

The Court agrees with White that Scott's timely designation of Quinn is inadequate under Rule 26(a)(2)(C), and that his untimely designation should be stricken. A district court may strike a parties' expert witnesses as a sanction for its failure to timely disclose the information required by Rule 26(a)(2). *Geiserman v. MacDonald*, 893 F.2d 787, 792 (5th Cir. 1990). It must decide whether to allow late disclosure by weighing four factors: "(1) the explanation for the failure to [meet the deadline]; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Id.* at 791. Where multiple factors weigh against the party seeking to designate an expert witness, a court is within its discretion to exclude evidence from that expert. *Reliance Ins. Co. v. Louisiana Land & Expl. Co.*, 110 F.3d 253, 258 (5th Cir. 1997). In Scott's favor, Quinn's testimony is relatively unimportant, as her testimony is irrelevant to White's liability. However, the remaining factors counsel exclusion. Scott provides no explanation for his failure to timely comply with Rule 26(a)(2). Scott has not requested a continuance to cure any prejudice to White resulting from the late disclosure, and the Court—which has already reset the trial to account for Scott's inaction—would be disinclined to grant one if he had. Because multiple *Geiserman* factors weigh against Scott, the Court is within its discretion to exclude expert testimony from Quinn. It elects to do so.

### B. Motion to Exclude Opinions and Testimony of Kimberly Bustos

Bustos is a former law enforcement officer designated to testify as an expert on the use of force. (Bustos Resume, Dkt. 80-1, at 2–10; Resp. Mot. Exclude Bustos, Dkt. 81, at 1). White seeks to exclude her because she lacks the specialized knowledge to testify on the use of force. (Mot. Exclude

Bustos, Dkt. 80). The Court agrees with Scott that Bustos is qualified to testify as an expert in this case.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 provides that "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. District courts must act as gatekeepers to ensure that expert testimony is both reliable and relevant. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). "To qualify as an expert, the witness must have such knowledge or experience in his field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (citation and internal quotation marks omitted) (cleaned up). The party seeking to admit expert testimony must demonstrate by a preponderance of the evidence that the expert is qualified and that her testimony will be relevant and reliable. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

Bustos is a private investigator and a peace officer with approximately 20 years of experience as a law enforcement officer. (Bustos Resume, Dkt. 80-1, at 2–10). From 1998 to 2004, Bustos served as a patrol officer for several cities and counties in Texas; additionally, for the past two years she has served as a reserve police officer for the City of Liberty Hill. (*Id.* at 2–6). Bustos received use-of-force training in 1999. (*Id.* at 9). Over the course of her career on patrol, Bustos made about 200 arrests. (Mot. Exclude Bustos, Dkt. 80, at 3).

White argues that Bustos is not experienced enough. He argues that Bustos only received "560 hours [of training] in a rural police academy 22 years ago to serve in small towns." (*Id.* at 2). White made more arrests in his first year on patrol than Bustos made over the course of her career. (*Id.* at 3). White argues that if Bustos is qualified to testify as an expert on excessive force, "then every small town peace officer patrolling rural areas is qualified." (*Id.* at 6).

The jury in this case will be asked to determine whether White's use of force was excessive. In doing so, the jury must consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The jury will have to determine the reasonableness of White's conduct "from the perspective of a reasonable officer on the scene," taking into account the "split-second judgment" that an officer might have to make in a "tense, uncertain, and rapidly evolving" situation. *Id.* Bustos need not be the most experienced law patrol officer Scott can find to aid the jury in this case; she need not even be more experienced than White. "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993)). Having served as a patrol officer for over six years, Bustos can help the trier of fact understand the facts of this case from a reasonable officer's perspective. If White believes that the jury should give less weight to Bustos's testimony because of where she served as a peace officer, he can make his case to the jury at trial. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

White also argues that Bustos has "no defined methodology" for reaching the conclusions in her expert report, which are not the result of "any reliable methodology or scientific analysis." (Mot. Exclude Bustos, Dkt. 80, at 7, 8). Instead, "her sole methodology is to look at the situation with 20/20 hindsight and determine what she would have done." (*Id.* at 7). Of course, assessing the reasonableness of a police officer's use of force is not a scientific inquiry. In her expert report, Bustos interprets Scott's behavior and White's responses according to her professional experience and training. (Bustos Report, Dkt. 80-1, at 19–26). Such testimony will aid the trier of fact in assessing the facts from a reasonable officer's perspective. Bustos will be permitted to testify as an expert; the Court will consider objections to particular components of her testimony at trial.[4]

## V. MOTION FOR SUMMARY JUDGMENT

White seeks summary judgment on Scott's sole remaining claim in this action: his excessive force claim against White. (Mot. Summ. J., Dkt. 82, at 13–22). Scott filed an untimely response, (Dkt. 86), which White moved to strike in its entirety, (Dkt. 88). Scott then sought an extension of his deadline to file a response. (Dkt. 90). The Court will address White's motion to strike before considering the merits of his summary judgment motion.

### A. Motion to Strike Response and Motion to Extend Time to Respond

White filed his motion for summary judgment on November 16, 2018. (Dkt. 82). Under the Court's local rules, Scott's response was due by November 30, 2018. W.D. Tex. Loc. R. CV-7(e)(2). Plaintiff's counsel miscalendared Scott's response date and filed five days later on December 5. (Dkts. 86, 90). When a party seeks to extend a deadline after that deadline has passed, Federal Rule of Civil Procedure 6(b)(1)(B) grants a district court discretion to allow untimely responses where "the party failed to act because of excusable neglect." Relevant factors to the excusable neglect

---

[4] For example, Bustos's expert report contains legal conclusions. (*See, e.g.*, Bustos Report, Dkt. 80-1, at 27–28). A witness may not testify as to legal conclusions. *United States v. Izydore*, 167 F.3d 213, 218 (5th Cir. 1999).

inquiry include: "the danger of prejudice to the [nonmovant], the length of the delay and its potential impact on the judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Adams v. Travelers Indem. Co. of Connecticut*, 465 F.3d 156, 162 n.8 (5th Cir. 2006).

Scott's reason for missing the deadline does not favor extension. However, the delay was brief and the prejudice to White negligible. Moreover, Scott appears to have acted in good faith under a mistaken belief. The Court finds that Scott's late filing is due to excusable neglect and extends his deadline to respond to White's summary judgment motion to December 5, 2018.[5]

However, White's motion to strike also contains specific objections to components of Scott's response. (Mot. Strike, Dkt. 88, at 2–3). Scott did not file a response to White's motion to strike. When no timely response is filed to a nondispositive motion, the Court may grant the motion as unopposed. W.D. Tex. Loc. R. CV-7(e)(2). The Court elects to do so here. Accordingly, the following summary judgment evidence is stricken from the record for purposes of summary judgment: (1) the suppression hearing transcript, (2) the PNAS article on slow-motion video, and (3) the Reuters article on Taser deaths. (Dkts. 86-1, 86-2, and 86-3).

### B. *Motion for Summary Judgment*

White seeks summary judgment on Scott's excessive force claim. (Mot. Summ. J., Dkt. 82, at 13–22), the only remaining claim in this action. For the reasons given below, the Court finds that White's motion should be denied.

---

[5] "To mitigate the prejudicial consequences to litigants of their counsels' incompetence, trial judges occasionally avert their glance when the application of clear rules might otherwise prevent adjudication upon the merits of a client's case." *Hunt v. Texas Mut. Ins. Co.*, 54 F. App'x 799 (5th Cir. 2002).

## 1. Legal Standard

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

If the burden at trial rests on the nonmovant, the movant must merely demonstrate an absence of evidentiary support in the record for the nonmovant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant does so, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 335 (5th Cir. 2017). After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000).

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* Even when considering a qualified immunity defense, however, the court must view the evidence in the light most favorable to the nonmovant and draw all inferences in the nonmovant's favor, *Rosado v. Deters*, 5 F.3d 119, 122–23 (5th Cir. 1993), and cannot make credibility determinations or weigh the evidence, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

That said, when one party's version of the facts "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. "Although courts view evidence in the light most favorable to the nonmoving party, they give greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene. *Griggs v. Brewer,* 841 F.3d 308, 312 (citing *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011)). An unclear video is not enough to discount the nonmovant's reasonable interpretation of the facts. *Ramirez v. Martinez,* 716 F.3d 369, 374 (5th Cir. 2013).

## 2. Summary Judgment Evidence

On the morning of February 20, 2015, White was responding to a report of a suspicious person identified as a black female when he drove past Scott, a white male, on the sidewalk of Wheless Lane in Austin, Texas. (Mot. Summ. J., Dkt. 82, at 4; Resp. Mot. Summ. J., Dkt. 86, at 1). White pulled over, exited his car, and approached Scott. (Mot. Summ. J., Dkt. 82, at 5). White asked Scott for identification, and Scott responded that he had been homeless for the last couple of days. (Dashcam Video, Dkt. 82-1 Ex. 1A, at 0:50–0:55). He asked Scott whether he was with a black female and repeated his request for identification; Scott responded that he was alone and that he did not have identification. (*Id.* at 0:50–1:15). White asked Scott if he had been arrested before, and Scott said that he had. (*Id.* at 1:15–1:20). White asked Scott what he had been arrested for; Scott did not answer. (*Id.* at 1:20–1:25). White then asked Scott for his name several times, but Scott stood silently without responding. (*Id.* at 1:25–1:50).[6]

---

[6] White argues that he suspected Scott of burglary because Scott was in a "hot spot for daytime burglaries," he was "hidden in the bamboo of the caller's fence," and he had suitcases with him that might be used to carry stolen items. (White Aff., Dkt. 82-1, at 150–51). White's position is disputed; Scott states that he was "merely standing on a public sidewalk." (Resp. Mot. Summ. J., Dkt. 86, at 9). Because the video evidence does not blatantly contradict Scott's position, the Court must construe these disputed facts in his favor for purposes of summary judgment.

At that point, White asked Scott if he had any weapons, which Scott denied. (*Id.* at 1:50–1:56). White then reached out, grabbed Scott's left wrist, and instructed him to drop whatever was enclosed in his right fist as Scott stood facing him. (*Id.* at 1:56). Scott did not drop the item in his right hand;[7] White, still holding Scott's left wrist, repeated his command to put the item down several times. (*Id.* at 1:57–2:01). The following exchange then occurred:

Scott: "Will you please stop?"

White: "Put it down."

Scott: "Why are you touching me right now?"

White: "Listen to me."

Scott: "Stop. Why are you touching me?"

White: "You need to stop."

Scott: "Stop. You're hurting my hand."

White: "Put your hands behind your back."

Scott: "Ow. You're hurting my hand."

White: "Put your hands behind your back."

Scott: "Why?"

White: "Put your hands behind your back."

Scott: "Why?!"

(*Id.* at 2:01–2:15). White then struck Scott in the head with his elbow and took him to the ground. (*Id.* at 2:15–2:20). For about twenty seconds, Scott twisted and turned underneath White as the officer punched, elbowed, and kneed him in the head repeatedly. (*Id.* at 2:20–2:45). White commanded Scott several times to put his hands behind his back; Scott covered his head with his

---

[7] White later described that item as a circular silver object that resembled a "miniature hub cap." (Dashcam Video, Dkt. 82-1 Ex. 1A, at 16:14–16:45).

hands. (*Id.*). White then drew his electronic control weapon ("ECW") and applied it to Scott. (*Id.* at 2:45–2:48).

The parties dispute exactly what happened next. White states that Scott grabbed the ECW and stunned White with it. (Mot. Summ. J., Dkt. 82, at 6). Scott denies taking control of White's ECW or using it against White. (Scott Dep., Dkt. 82-1, at 68–69).[8] According to Scott, he grabbed White's arm while White was tasing him and White "got tased through [him]." (*Id.* at 68). The video does not so blatantly contradict Scott's position that the Court must not adopt it. *Scott*, 550 U.S. at 380. The video does appear to show the two men struggling for control of White's left hand, with which White appeared to draw his ECW. (*Id.* at 2:48–2:55). White can be heard yelling, "Let go of my Taser." (*Id.* at 3:08). However, the video does not clearly show Scott's possession of the ECW, nor does it clearly show Scott applying the ECW to White. (*Id.* at 2:48–3:18). White continuously had dominant position on Scott, pressing Scott against the sidewalk with his body weight as Scott writhed around underneath him. (*Id.*). From the moment White first used his ECW on Scott until Scott was finally subdued, White was able to punch or knee Scott on or near the head nine more times. (*Id.*). It may be true that Scott deployed White's ECW against him, but the video does not so utterly discredit Scott's position that he did not control or use the ECW that the Court can adopt White's version of this fact dispute at summary judgment.

Emergency medical services arrived after the incident and treated both Scott and White for injuries.[9] Scott complained of throbbing in his head, and EMS noted facial abrasions without

---

[8] In his deposition, Scott was asked whether he "had the taser in [his] hand"; he initially responded, "yeah, it was in my hand," but later denied having the taser in his hand. (Scott Dep., Dkt. 82-1, at 69). When pushed to clarify the discrepancy, Scott stated that "at one point I grabbed [White's] arm, and he got tased through me." (*Id.*).

[9] White broke his right ring finger during this incident. (White Aff., Dkt. 82-1, at 155 ¶ 44). Although he avers that he believes the injury occurred while he and Scott were "struggling over [his] Taser," he concedes that the injury "possibly occurred from delivering strikes." (*Id.*). On the date of the incident, when he was speaking to two other officers, he told

significant bleeding. (EMS Report, Dkt. 82-2, at 4). EMS also found a taser probe embedded in Scott's chest. (*Id.*). He was then taken to Brackenridge Hospital, where he was diagnosed with a facial abrasion and head contusion. (Hospital Records, Dkt. 82-2, at 14). Scott states that in addition to the pain resulting from his physical injuries, he also suffered psychological injuries that include exacerbation of preexisting mental health disorders. (Resp. Mot. Summ. J., Dkt. 86, at 10–11).

### 3. Discussion

White argues that he is entitled to summary judgment on the basis of qualified immunity. (Mot. Summ. J., Dkt. 82, at 13). Accordingly, the Court must decide (1) whether White "violated a statutory or constitutional right" belonging to Scott, *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011); and (2) whether "the right was 'clearly established' at the time of the challenged conduct." *Id.* (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)). The Court has the discretion to decide the order in which to answer these two questions, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), and elects to do so in the manner set forth below.

#### *i. Violation of Constitutional Right*

The Fourth Amendment creates a "right to be free from excessive force during a seizure." *Poole*, 691 F.3d at 627. To prove an excessive force claim, Scott must show that "in addition to being seized, he suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 846 (5th Cir. 2009) (citation and quotation marks omitted). The first element turns on the second and third, *Sam v. Richard*, 887 F.3d 710, 714 (5th Cir. 2018), which are typically analyzed together according to the factors enunciated in *Graham*, 490 U.S. at 396. *See Hanks v. Rogers*, 853 F.3d 738, 745 (5th Cir. 2017) (analyzing the second and third factors together).

---

them that he thought he had broken his hand. (Dashcam Video, Dkt. 82-1 Ex. 1A, at 17:13). "What'd you do?" asked one of the officers. (*Id.* at 17:15). "I was punching the shit out of him," White responded. (*Id.* at 17:17).

To establish the first element of an excessive force claim, a plaintiff must prove more than a *de minimis* injury. *Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005). "Any force found to be objectively unreasonable necessarily exceeds the *de minimis* threshold, and, conversely, objectively reasonable force will result in *de minimis* injuries only." *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (citation and quotation marks omitted). Stated differently, "as long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Id.* (quoting *Brown v. Lynch*, 524 F. App'x 69, 79 (5th Cir. 2013)); *see also Sam*, 887 F.3d at 714 (citing *Alexander*'s "some injury" rule and finding that minor bleeding sufficed to meet it). Scott has produced evidence of some injury: he was tased; he was punched, kneed, and elbowed at least a dozen times, resulting in cuts and bruises to his head and face; and he claims psychological injuries. (EMS Report, Dkt. 82-2, at 4; Hospital Records, Dkt. 82-2, at 14; Resp. Mot. Summ. J., Dkt. 86, at 10–11). The question, then, is whether White's use of force was clearly excessive and objectively unreasonable.[10]

White admits that he tased Scott for seven seconds. (White Aff., Dkt. 82-1, at 155 ¶ 41; Reply Mot. Summ. J., Dkt. 87, at 5 n.3). White also admits that he struck Scott sixteen times: a "forearm strike to the brachial nerve"; "two closed fists to the head"; "two forearm strikes to the head"; a "knee strike to the back"; "two open palm strikes"; "four face strikes"; "one strike to the face, head, and back"; and "two knee strikes to the back." (*Id.*). The dashcam video is consistent

---

[10] Citing *Westfall v. Luna*, 903 F.3d 534 (5th Cir. 2018), White argues that Scott's injuries cannot support an excessive force claim because they are *de minimis*. (Mot. Summ. J., Dkt. 82, at 16 (citing *Westfall*, 903 F.3d at 549 ("This court has held the following types of injuries to be *de minimis*: abrasions, back and neck pain, and contusions.") (citing *Brooks v. City of W. Point, Miss.*, 639 F. App'x 986, 990 (5th Cir. 2016)))). *Westfall*'s categorical exclusion of specific *de minimis* injuries stands in direct conflict with the "some injury" rule explained and applied by the Fifth Circuit in *Alexander* and *Sam*. *Westfall* does not mention *Alexander* or *Sam*, much less explicitly overrule them. Instead, *Westfall* cites *Brooks*, an unreported case, in support of its *de minimis* injury rule. *See Westfall*, 903 F.3d at 549–50. Faced with this discrepancy, the Court will follow the "some injury" rule applied in *Sam*, which looks to *Alexander*, a reported case. *See also Huang v. Harris County*, 264 F.3d 1141, at *9 (5th Cir. 2001) ("'[T]he amount of injury necessary to satisfy our requirement of 'some injury' and establish a constitutional violation is directly related to the amount of force that is constitutionally permissible under the circumstances.") (quoting *Williams v. Bramer*, 180 F.3d 699, 703–04 (5th Cir. 1999), *clarified*, 186 F.3d 633, 634 (5th Cir. 1999)).

with White's account: it shows White deploying his ECW against Scott and striking Scott at least a dozen times with his fist, elbow, or knee—often in the face or head—while pinning Scott beneath him on a paved sidewalk. (Dashcam Video, Dkt. 82-1 Ex. 1A, at 2:15–3:30). White defends these uses of force as reasonable responses to Scott's resistance. (*Id.* at 153–155).

"Excessive force claims are necessarily fact-intensive; whether the force used is excessive or unreasonable depends on the facts and circumstances of each particular case." *Darden*, 880 F.3d at 728 (cleaned up). In reviewing the facts and circumstances of a case, the court should consider "the totality of the circumstances, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* at 728–29 (quoting *Graham,* 490 U.S. at 396). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham,* 490 U.S. at 396). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (quoting *Graham,* 490 U.S. at 396–97). "[O]fficers must assess not only the need for force, but also the relationship between the need and the amount of force used." *Deville*, 567 F.3d at 167 (citation and internal quotation marks omitted). "[T]he speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need." *Trammell v. Fruge*, 868 F.3d 332, 342 (5th Cir. 2017) (citing *Deville*, 567 F.3d at 167). For the reasons discussed below, the Court finds that, viewing the facts in the light most favorable to Scott, White's uses of force—both his initial strike and the subsequent strikes and taser application once he took Scott to the ground—were clearly excessive and objectively unreasonable.

## (a) The Initial Use of Force

White justifies his uses of force differently based on the stage of the encounter. With respect to his initial use of force, in which he elbowed Scott in the neck and took him to the ground, White argues that he was justified in doing so by Scott's noncompliance. (*See* Mot. Summ. J., Dkt. 82, at 18 ("A forearm strike to the neck was not clearly excessive at the moment Sgt. White saw the shine of the metal object in a hand being raised toward his head, an object Scott suspiciously refused to drop after repeated commands.")).[11] Applying the *Graham* factors, a reasonable jury could conclude that White's initial use of force was unreasonable. The first *Graham* factor—the severity of the crime at issue—weighs in favor of Scott at this stage. Viewing the evidence in the light most favorable to Scott, White did not reasonable suspect him of burglary and Scott was "merely standing on a public sidewalk" when White approached him. (Resp. Mot. Summ. J., Dkt. 86, at 9). When a suspect is stopped for a minor offense such as speeding, the need for force is "substantially lower than if she had been suspected of a serious crime." *Deville*, 567 F.3d at 167. Such is the case, to an even greater extent, when a plaintiff is not suspected of any crime prior to the use of force.

The second *Graham* factor—whether Scott posed a threat to the officers—also weighs in Scott's favor. Viewing the evidence in the light most favorable to Scott, Scott was standing still on an otherwise empty street when White first struck him and tackled him. (Dashcam Video, Dkt. 82-1 Ex. 1A, at 2:10–2:20). Scott failed to answer some of White's questions and did not drop the object in his hand when commanded to. (*Id.*). However, a reasonable jury could find that Scott was not raising a metal object "towards [White's] head" or pulling away from White's grasp. (Mot. Summ. J.,

---

[11] At summary judgment, the Court cannot find that Scott raised his hand or the object in it towards White's head. Scott states that "he tried to step away from White" and that White "became violent" in response. (Resp. Mot. Summ. J., Dkt. 86, at 4). The video does not so utterly contradict Scott's position that the Court cannot adopt it. *Scott*, 550 U.S. at 380. In the instant before White strikes Scott's neck, his right hand is by his side and a reasonable juror could conclude that a reasonable officer in White's position would not have thought Scott was moving his right hand toward him. (Dashcam Video, Dkt. 82-1 Ex. 1A, at 2:12–2:17).

Dkt. 82, at 19–20). In such circumstances, Scott's resistance is at most passive, which does not justify a takedown, much less a strike to the neck before a takedown. *Hanks*, 853 F.3d at 746 (holding that, where the plaintiff merely failed to comply with verbal instructions, no reasonable officer would have perceived "an 'immediate threat' warranting a physical takedown").

The final *Graham* factor—whether Scott actively resisted arrest or attempted to flee—also weighs in Scott's favor. Again, viewing the evidence in the light most favorable to Scott, his resistance to White was at most passive resistance to White's questions and commands. A reasonable jury could conclude that White was standing still and not attempting to flee or pull his arm out of White's grasp. Under such circumstances, an officer uses excessive force by striking and taking down a person. *Hanks*, 853 F.3d at 746; *Trammell*, 868 F.3d at 343 ("Where an individual's conduct amounts to mere passive resistance, use of force is not justified.") (cleaned up).[12]

Altogether, then, each *Graham* factor tilts in Scott's favor at this stage in the litigation with respect to White's initial use of force. Considering the totality of the circumstances, construing the evidence in Scott's favor, and viewing that version of events as a reasonable officer would have, the Court finds that a reasonable jury could determine that White's initial use of force, before Scott was on the ground, was clearly excessive and objectively unreasonable.

### (b) Subsequent Uses of Force after White Took Scott to the Ground

White argues that "[t]he strikes on the ground were not clearly excessive because Scott was spinning them both around refusing verbal commands screaming hysterically." (Mot. Summ. J., Dkt. 82, at 18). Moreover, he argues that "[t]he taser was not excessive when repeated strikes were unsuccessful." (*Id.*). Once again, the first *Graham* factor weighs in Scott's favor when the facts are

---

[12] Even if a jury were to find that Scott was pulling out of White's grasp, it is excessive to strike and take down a suspect simply because he pulls out of the officer's grasp. *Trammell*, 868 F.3d at 342; *Ramirez*, 716 F.3d at 378.

viewed in the light most favorable to him, as he was not reasonably suspected of any crime under those facts.

At summary judgment, the second and third *Graham* factors weigh in Scott's favor as well. The video shows that Scott refused to comply with White's commands and resisted arrest by writhing around underneath White instead of lying still so he could be handcuffed.[13] (Dashcam Video, Dkt. 82-1 Ex. 1A, at 2:15–3:20). After White took Scott to the ground, the video shows that Scott did not follow White's commands to put his hands behind his back while twisting and turning underneath White and covering his head with his hands as White punched, elbowed, and kneed his face and head. (*Id.*). After White deployed his ECW against Scott, the video shows Scott grabbing White's left hand and continuing to twist and turn underneath White as White delivered another series of strikes. (*Id.* at 2:45–3:20). Although the video shows Scott disobeying White's commands and continuing to move around under White rather than lying still, Scott states that he attempted to comply with White's commands but could not do so because White was pinning him down and striking him. (Resp. Mot. Summ. J., Dkt. 86, at 5). Moreover, Scott's expert, a former patrol officer, interprets Scott's actions after being taken to the ground as defensive rather than resistive. (Bustos Report, Dkt. Dkt. 80-1, at 24–25 ¶¶ 62–67). The video does not so blatantly contradict Scott's position that the Court cannot adopt it at this stage; a reasonable jury could find that Scott's movements were restricted by White and were protective or involuntary responses to White's uses of force. Upon making such a finding, a reasonable jury could conclude that White's use of force was "clearly excessive to the circumstances," *Trammell*, 868 F.3d at 342, particularly when White "engaged in very little, if any, negotiation" with Scott before using force. *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012) (citing *Deville*, 567 F.3d at 168).

---

[13] As discussed above, there is a genuine fact dispute concerning whether Scott gained control of White's ECW and used it against him. *See supra* at 18. The Court cannot find that fact at this stage of the litigation.

Altogether, then, each *Graham* factor tilts in Scott's favor at this stage in the litigation with respect to White's subsequent uses of force. Considering the totality of the circumstances, construing the evidence in Scott's favor, and viewing that version of events as a reasonable officer would have, the Court finds that a reasonable jury could determine that White's subsequent uses of force, after Scott was on the ground, were clearly excessive and objectively unreasonable.

<u>*ii. Clearly Established Law*</u>

A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). While there need not be "a case directly on point . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)). Essentially, an officer must have "fair notice" that his actions would result in the violation of a constitutional right. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

In the context of a pretrial motion, the Court must determine whether an officer is entitled to qualified immunity in light of the applicable standard of review. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (holding that at summary judgment, a court cannot resolve fact disputes pertaining to either prong of qualified immunity in favor of the moving party). The fundamental question, then, is whether White would have had fair notice that his actions were unreasonable, based on the evidence viewed in the light most favorable to Scott. *Hope*, 536 U.S. at 740.

Scott argues that his right to be free from excessive force was clearly established at the time of the incident. (Resp. Mot. Summ. J., Dkt. 86, at 12 (citing *Tarver*, 410 F.3d at 753–54)). White responds that both his initial use of force and his subsequent uses of force were reasonable under clearly established law. (Reply Mot. Summ. J., Dkt. 87, at 6–10).

Regarding White's use of force before taking Scott to the ground, it was clearly established law in the Fifth Circuit before February 2015 that an officer "violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation." *Hanks*, 853 F.3d at 747 (describing clearly established law as of February 2013, and citing *Deville*, 567 F.3d at 167–69 (denying qualified immunity where an officer making a minor traffic stop pulled the plaintiff out of her car and threw her up against the car because she passively resisted commands and presented no safety threat or flight risk)); *Trammell*, 868 F.3d at 343 (holding that "the law [as of January 2013] clearly established that it was objectively unreasonable for several officers to tackle an individual who was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp") (citing *Ramirez*, 716 F.3d at 379; *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)). Viewed in the light most favorable to Scott, the facts here are not even as favorable to White as they were to the officers in *Hanks* or *Trammell*. Scott was not stopped for a minor traffic violation; he was suspected of no crime at all. *See Hanks*, 853 F.3d at 745. Moreover, a reasonable jury could find that Scott did not even actively resist by a physical act such as pulling his arm out of an officer's grasp. *See Trammell*, 868 F.3d at 341. Just as the law at the relevant time for those decisions—the facts of which predate the incident here—clearly established that those officers' conduct was proscribed by the Fourth Amendment, so too does that law suffice to give White fair notice that his initial use of force was objectively unreasonable.

As for White's uses of force after taking Scott to the ground, a jury may conclude that Scott actively resisted White's commands by twisting and turning underneath White, and at times grabbing White's hands, rather than submitting to being handcuffed. (Dashcam Video, Dkt. 82-1 Ex. 1A, at 2:15–3:20). Under those circumstances, no clearly established law would have given White fair notice

that his uses of force after taking Scott to the ground were unlawful. *See Darden*, 880 F.3d at 732

(*citing Carroll v. Ellington*, 800 F.3d 154, 174–75 (5th Cir. 2015)); *see also Griggs*, 841 F.3d at 315 (holding

that "no settled authority" as of February 2013 put an officer on notice that it was unconstitutional

to put his weight on top of a person on the ground and use "non-deadly punches" to gain control of

the person's arms) (citing *Poole*, 691 F.3d at 627). But courts must analyze both prongs of summary

judgment without resolving genuine disputes of fact in favor of the movant. *Tolan*, 672 U.S. at 656.

As discussed above, a reasonable jury could view Scott's movements on the ground as involuntary

or defensive movements taken to protect himself against White's uses of force. White had dominant

physical position on Scott, and a jury could credit Scott's statement that he was unable to put his

hands behind his back while White was pinning him down and striking him. Under those

circumstances, clearly established law in the Fifth Circuit as of February 2015 was sufficient to give

White notice that his White's subsequent uses of force after taking Scott down were excessive to the

need. *See Newman*, 703 F.3d at 764 (holding that, where none of the *Graham* factors justified using a

taser, it was "an obvious case" in which the *Graham* factors themselves "clearly establish the

answer") (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)); *see also Darden*, 880 F.3d at 729–32

(noting a fact dispute concerning whether the plaintiff had resisted being handcuffed, acknowledging

that a reasonable jury could find that the plaintiff had not actively resisted, and holding that the law

clearly established as of May 2013 that "a constitutional violation occurs when an officer tases,

strikes, or violently slams an arrestee who is not actively resisting arrest.") (*citing Ramirez*, 716 F.3d at

377–78; *Newman*, 703 F.3d at 762–63; *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008)). As in *Darden*,

whether clearly established law would have given White fair notice that his conduct was

unreasonable depends on the resolution of disputed facts about how a reasonable officer would

have viewed Scott's conduct. And as in *Darden*, if the facts are viewed in the light most favorable to

Scott, clearly established law would have given White fair notice that his uses of force after taking

Scott to the ground were objectively unreasonable. White is not entitled to qualified immunity at this stage in the litigation.

## VI. CONCLUSION

For the reasons stated above, **IT IS ORDERED** as follows:

First, Scott's illegal search claim against White and his claims against the City are **STRICKEN** from his third amended complaint.

Second, White's second motion for judgment on the pleadings, (Dkt. 66), is **GRANTED**. Scott's false arrest claim and due process claim against White are each **DISMISSED WITH PREJUDICE**.

Third, White's motion to exclude the expert opinion and testimony from Jo Kathryn Quinn, (Dkt. 74), is **GRANTED**.

Fourth, White's motion to exclude the expert opinion and testimony from Kimberly Bustos, (Dkt. 80), is **DENIED**.

Fifth, White's motion to strike Scott's response to his motion for summary judgment, (Dkt. 88), is **GRANTED IN PART AND DENIED IN PART**. White's motion to strike is granted for purposes of summary judgment concerning only (1) the suppression hearing transcript, (2) the PNAS article on slow-motion video, and (3) the Reuters article on Taser deaths. (Dkts. 86-1, 86-2, and 86-3). It is denied in all other respects. Relatedly, Scott's motion to file an untimely response to that motion, (Dkt. 90), is **GRANTED**.

Finally, White's motion for summary judgment, (Dkt. 82), is **DENIED**.

**SIGNED** on January 7, 2019.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE